## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **DENNIS HARRIS** | : | **CASE NO. 1:07CV069** |
| **Plaintiff,** | : | **Judge Michael R. Barrett** |
| | : | |
| **vs.** | : | |
| | : | |
| **BUTLER COUNTY, OHIO, et al.,** | : | **ORDER** |
| **Defendants** | : | |

This matter is before the court on Defendant's Motion for Summary Judgment, (Doc. #

17).  Plaintiff has responded (Doc. # 22 ) and Defendant as replied (Doc. # 24 ).  Also pending is

Defendant's Motion for a Protective Order (Doc. # 23) and Defendant's Motion to Strike

Plaintiff's Notice of Filing and Attachments (Doc. # 36).


I.      **FACTUAL BACKGROUND**

In this matter, the Plaintiff challenges his termination from his position as a deputy sheriff

in the Butler County Sheriff's Department.  Plaintiff's claims all stem from his belief that he was

unconstitutionally and wrongfully terminated because he failed to support the current sheriff in

his campaign.

Plaintiff was initially hired in 1999 for the third shift in the corrections division of the

sheriff's office.  He learned of possible openings in the sheriff's department through a member of

1

his church, the then Butler County Sheriff, Don Gabbard.  Following a brief break when Mr.

Harris tried a different job outside of the sheriff's department, he returned to the Sheriff's

department in the corrections division where he remained until his separation in January of 2006.

During Mr. Harris' time with the Butler County Sheriff's Department, in November of

2004, Defendant Richard Jones was elected to the position of Butler County Sheriff.  In January

of 2005, Sheriff Jones began his new position.  All deputy sheriffs, including the Plaintiff, were

required to go through a new re-swearing in ceremony with the new sheriff, pursuant to which

Plaintiff Harris received his regular commission.  Harris, however, did not receive his special

commission, which would allow him to carry a weapon and would be entitle him to work extra

pay details.  Plaintiff Harris claims he tried to set up a  meeting with Sheriff Jones to discuss the

commission, but could not get one scheduled.

Plaintiff Harris and Sheriff Jones were never able to discuss the commission question

until approximately two months later, in March of 2005, when they passed each other in a

hallway.  The parties disagree about the details of this conversation.  Because this disagreement

is important to the summary judgment issue before the Court, it will be addressed in detail.

Plaintiff Harris claims that he asked Sheriff Jones why he did not reinstate Harris' special

commission.  According to Harris, Sheriff Jones responded that it was because "you was out

campaigning for Patton" (Harris depo. at 87).  Patton was one of Jones' opponents.  When

Plaintiff Harris denied that he was campaigning for Patton, Sheriff Jones responded that "I heard

you was at a fundraiser . . . and you was really shoveling it on me and talking bad [about me]

(Harris depo. at 87-88).  Plaintiff Harris denied any involvement with the Patton campaign.

Plaintiff Harris contends that Sheriff Jones continued and complained that Plaintiff Harris

2

had never campaigned for him but did campaign for his predecessor, former Sheriff Don Gabbard (Harris depo at 105). Plaintiff Harris responded that he does not get involved in campaigns. However, he admitted to Jones that he attended former Sheriff Gabbard's "hog roast," because it was held at Plaintiff Harris' church. The hog roast was Sheriff Gabbard's primary fund raising event.

Additional background information is helpful to completely understand the significance of this conversation. Plaintiff Harris and former Sheriff Gabbard's family belong to the same church. Also involved is another Butler County Deputy Sheriff, Roger Brooks. Brooks is the son-in-law of former Sheriff Gabbard and is also Plaintiff Harris' good friend (Harris depo. at 109-110). Apparently there is a long standing hostile relationship between former Sheriff Gabbard and Sheriff Jones and their families, which Plaintiff Harris believes contributed to Sheriff Jones' animosity toward him (Harris depo. at 88-108, 194).

At the time of the hallway conversation between Plaintiff Harris and Sheriff Jones, Sheriff Jones said he would get back to Harris about his special commission (Harris depo. at 110). Several days later, Sheriff Jones advised Plaintiff Harris that he had decided to give him his special commission after his wife had talked him into it (Harris depo. at 88, 115). The special commission was formally tendered in early March of 2005 (Harris depo. at 302). Thus, Plaintiff Harris was without the special commission for two to three months.

As Defendant points out, however, Plaintiff Harris testified that he would not have had time to use the special commission even if he had had it during that time, because he was too busy. Moreover, he chose not to use it for extra duty after he received it, also because he was too busy (Harris depo. at 118).

3

Plaintiff Harris also points to additional actions and comments of Sheriff Jones that indicate to him that he was terminated for political reasons. Plaintiff Harris claims that he was denied a transfer from the corrections division to work in court security (Harris depo. at 126). Plaintiff Harris claims that Sheriff Jones stated he would not grant the transfer because "I can't have you and Roger Brooks over there talking about me" (Harris depo. at 116). However, Defendant correctly points out that Plaintiff Harris never formally requested or submitted an application for the position of court security officer (Harris depo. at 116, 303). Harris claims that everyone knew he wanted the transfer even if he did not actually apply for it (Harris depo at 126).

The focus of the factual background now turns to what Sheriff Jones claims was the reason for Plaintiff Harris' termination. When Plaintiff Harris worked in the correctional facility, part of his job was to monitor the inmates, many of whom were female. Plaintiff Harris claims that as part of his Christian background, he wanted to encourage and help the repeat offenders improve their lives. Plaintiff Harris took particular interest in one repeat offender inmate, Ms. Tabitha Holland.

Following Ms. Holland's release from the Butler County Jail, Plaintiff Harris obtained her address from the jail records and contacted Ms. Holland on several occasions. For his first attempt, Harris called Ms. Holland at her home and spoke to her mother (Harris depo. at 229). Harris was told by her mother that Ms. Holland was not at home. The next contact was when he called from a gas station near her home and actually spoke to Ms. Holland. (Harris depo. at 242). However, he identified himself as Deputy Sheriff David Harris, rather than Dennis Harris. He claims he used a different name because he did not want Ms. Holland to be able to track him down and call him at home. *Id.* At that time, he asked if she would agree to step outside her

4

home and talk with him. Apparently she did not agree to do so, because Plaintiff Harris offered

to call her another time. Plaintiff Harris contacted Ms. Holland a third time, and this time she

agreed to come outside and talk to him at his car (Harris depo. at 247).

Plaintiff Harris contacted Ms. Holland on yet another occasion on his way home from

work. He met her outside of her house and he was still in his work uniform (Harris depo at 259).

Still on another occasion, Plaintiff Harris came to Ms. Holland's house and she came out and got

into his car (Harris depo. at 251).

There is a dispute as to what happened at this meeting in the car. Plaintiff Harris claims

that he and Ms. Holland spoke for a while about her plans to turn her life around. At the end of

the conversation, he claims Ms. Holland gave him a hug and a brief kiss. Plaintiff Harris claims

that the contact went no further than this. (Harris depo. at 251). However, Ms. Holland alleged

that he placed his hand underneath her blouse, which Plaintiff Harris denies (Harris depo., Ex

M)(Harris depo at 251).

In January of 2006, Ms. Holland reported these contacts to her probation officer who, in

turn, reported it to Captain Katie McMahon of the Butler County Sheriff's office (Harris depo.,

Ex. M). Thereafter, on January 30, 2006, after Plaintiff Harris returned from one of his church's

mission trips, he was called to the Captain's office. When Plaintiff Harris arrived there, Captain

McMahon was there with a Butler County detective (Harris depo. at 269-270). Captain

McMahon presented Plaintiff Harris with a signed statement from Ms. Holland accused him of

several unwelcome attempts to contact her (Harris depo. at 269-270, Ex. M). This statement also

accused him of placing his hands under her blouse (Harris depo. at 270).

Plaintiff Harris admitted that he attempted to contact Ms. Holland to find out how she

was doing and he admitted to the conversation the two of them had in his vehicle outside of her house (Harris depo. at 270-72). He also admitted to a hug and a kiss but he denied any further sexual touching or impermissible conduct (Harris depo at 271). Captain McMahon then informed Plaintiff Harris that the interaction he initiated with Ms. Holland was in violation of the Sheriff Department's "Associations Policy." Harris was given the option of choosing to resign and avoid disclosure of the matter to the media or being terminated. He was told he could think about it over night (Harris depo. at 277).

The "Associations Policy" prohibits employees of the corrections department from establishing any type of personal relationship with an inmate of the facility during the period of incarceration. The policy further prohibits the same type of conduct between employees and former inmates prior to the expiration of a waiting period; 24 month for felony conviction incarcerations and 12 months for all other incarcerations (Defendant's Motion for Summary Judgment, Ex. 1, A).

Following the meeting with Captain McMahon, Plaintiff Harris went home and told his wife what happened (Harris depo. at 282). He explained that he had just lost his job because of his contact with Ms. Holland. Ms. Harris wanted to avoid public disclosure of this matter, so she urged him to resign. *Id.* The Harrises then contacted Plaintiff's union steward. The Harrises and the union steward met privately and Plaintiff was advised that if he did not resign and was later terminated, he could contest the termination but the process would take up to two years (Harris depo. at 285). Harris also asserts that his union steward told him he should be given 72 hours to decide and that could be a point to contest the termination (Harris depo. at 285).

Based upon all of these circumstances, Plaintiff Harris chose to resign. He resigned that

6

afternoon rather than wait until the next morning (Harris depo. at 287). His employment with the sheriff's office ended on January 30, 2006.

Defendant points out that Harris admited in his deposition that he was aware that his conduct violated the "Associations Policy," which could result in his termination (Harris depo. at 276, 288). He also admitted that he did not tell anyone about his contact with Ms. Holland because he knew he could be fired if he were found out (Harris depo. at 246).

Plaintiff Harris brings to the court's attention additional evidence that he believes supports his claim of retaliation and pre-text for his alleged constructive termination. Harris claims that there is a history of hiring and promotion decisions of Sheriff Jones that evidence a preference for people who will be beneficial to him politically.

In his response to Defendant's motion for summary judgment, at pages 16 - 18, Plaintiff Harris relies heavily upon the circumstances surrounding the hiring of a new deputy sheriff, Jeffrey Schuster. Deputy Sheriff Schuster had previously resigned from the Hamilton City Police Department when confronted with allegations that he had engaged in consensual sex with a female police officer on the force while on the job. What Plaintiff considers significant is that despite Sheriff Jones' knowledge of this conduct, he primarily relied upon the recommendation of Butler County Prosecutor Robin Piper in his decision to hire Deputy Sheriff Schuster. Plaintiff Harris claims that Sheriff Jones' considered mainly the recommendation of Robin Piper, a Republican who ran on the same ticket as Sheriff Jones, in his decision to hire Schuster.

Plaintiff Harris argues that this infers a double standard: Plaintiff Harris was fired for communicating with a former inmate after hours and not in uniform while another person with a history of more egregious conduct than his, was hired.

7

Harris also argues that when his long time friend and fellow deputy Roger Brooks did not get a job as a bailiff, that it was due to Sheriff Jones (Plaintiff's response, p. 18-20). Harris claims that when Sheriff Jones was contacted by the judge who wanted to hire Brooks, Jones told the judge that Brooks was disloyal and that he should not hire him. *Id.* Harris claims that this conduct supports his claim that Jones blocks the work opportunities for any deputy sheriff he regards as politically disloyal. *Id.*

In his complaint, Plaintiff has alleged constitutional violations based upon his First and Fourteenth Amendment rights of speech and association and constitutional due process violations, both substantive and due process. He has also made claims based on state law including rights of free speech and assembly, violation of Ohio public policy for retaliatory discharge, defamation and tortious interference with an employment relationship. The foregoing facts apply to all of Plaintiffs claims with the exception of his state claims for defamation and tortious interference with an employment relationship.

In support of his defamation and tortious interference claim, Plaintiff Harris asserts in his complaint that when he applied for jobs, he did not get them because he was given a bad reference by Butler County. He asserts that this claimed conduct constitutes intentional and tortious interference with the legitimate contract and business relationship between Plaintiff and potential future employers.

Conversely, as Defendants point out, Plaintiff stated in his deposition that he cannot trace the rejections from prospective employers to anything that Sheriff Jones or Butler County did (Harris depo. at 212). He further testified that he has no knowledge that Defendant's were responsible for his not getting any of the jobs for which he applied (Harris depo. at 213).

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986).  The moving party has the burden of showing an absence of evidence to support the non-moving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The mere existence of a scintilla of evidence to support the non-moving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the non-moving party. *Id.* at 252.

"In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990); see also *L.S. Heath & Son, Inc. v. AT&T Information Sys., Inc.,* 9 F.3d 561 (7th Cir. 1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir.), cert. denied, 506 U.S. 832, 121 L. Ed. 2d 59, 113 S. Ct. 98 (1992)("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary

9

judgment ...").  Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties." *Beatty v. UPS,* 267 F. Supp. 2d 823, 829 (D. Ohio 2003).

Where the non-moving party fails to respond to the motion or arguments within the motion, the court is still required to consider all the materials properly before it in order to determine if a genuine issue of material fact exits. *Sanabria v. Germain Motor Co.*, 2005 WL 2313950, Case No. C2:04-CV-508 (S.D. Ohio, Sept. 21, 2005).  Thus, although the non-moving party is required to set forth more than a scintilla of evidence supporting the essential elements of her claims, if she fails to respond, the court is to review to record on its own to discern whether there is any evidence to support her claims. *Taylor v. Unumprovident Corp.*, 2005 WL 3448052, Case No., 1:03CV1009 (E.D. Tenn., Dec. 14, 2005).  That review need not be a scouring of the record, but the court cannot simply dismiss the non-moving party's claims because no responses were filed.  If, after a fair review of the record by the court, the court does not find any such evidence, then the non-moving party will be deemed to have not put forth sufficient evidence to support her claim.  *Id.*

III.     **ANALYSIS**

         **A) Effect of Plaintiff's Failure to Respond to Defendant's Arguments**

In his complaint, Plaintiff alleges seven counts.  Specifically, those counts are:  Count I, Constitutional violations based upon his First and Fourteenth Amendment rights of free speech

10

and association; Count II, Constitutional substantive due process violation; Count III, procedural due process violations; Count IV, violation of Ohio Constitutional rights of free speech and assembly; Count V, violation of Ohio public policy for retaliatory discharge; Count VI defamation; and Count VII, tortious interference with an employment relationship.

In their motion for summary judgment, Defendants urge the Court to grant judgment on all of Plaintiffs' counts.  In his response to the motion, however, Plaintiff specifically responds only to the first count of unconstitutional retaliation for exercising his rights of free speech and political association.  There is no specific indication that Plaintiff intends to abandon the other causes of action.  With the exception of the first count for retaliation, the Court will examine each cause of action and corresponding arguments in the order presented in the complaint.  The retaliation count will be addressed thereafter.

### Count II: Denial of Substantive Due Process

Plaintiff claims that Defendants' articulated basis for constructively terminating Plaintiff was arbitrary, discriminatory and capricious.  This conduct has caused Plaintiff to be deprived of his property and liberty interests without substantive due process.

Defendants respond that Plaintiff does not seem to point to any fundamental right of Harris' that was infringed upon by the enforcement of the "Associations Policy" against him. Defendants also argue that the Plaintiff voluntarily resigned and, therefore, was not constructively discharged.  In addition, Defendants argue that even if Harris had been terminated, the Defendants' conduct was rationally related to its interests of maintaining the loyalty of its officers to the security of the jail, rather than be compromised by a personal relationship with an inmate or former inmate.

11

"The touchstone of substantive due process protection undoubtedly remains our history and social traditions." *Jacobs v. Baesler*, 910 F.2d 1349, 1355 (6th Cir. 1990).  The purpose of substantive due process guarantees is to protect against threats to liberty and justice and those rights that are fundamental such as the liberty to marry and other family choices. *Id.*  The right to a promotion or employment benefit does not rise to that level.  *Id.* at 1354, 1355.

Plaintiff has not addressed this argument in his response to the Defendants' motion.  Neither has the Court uncovered any evidence to suggest that the claimed constructive termination was a threat to the fundamental rights protected by the substantive due process clause.  Therefore, the Plaintiff has put forth no evidence to support count two of his complaint, and Defendants' motion for summary judgment shall be granted on ths issue.

**Count III: Denial of Procedural Due Process**

Plaintiff claims that he was denied procedural due process.  The specific facts that are intended to support this claim are not clear.  It is inferred, however, that Plaintiff believes he was not given sufficient time to make the decision to resign or be terminated.

Defendants argue that because his resignation was voluntary and he was given time to consider his options, he was not denied due process.

In order to establish a procedural due process claim under §1983, the plaintiff must show a property interest that was denied without sufficient process.  *Rhoades v. Bd. of Education of Mad River Local School District*, 103 Fed. Appx. 888, 2004 WL 1559481 (6th Cir. July 8, 2004).  A public employee with a property interest in continued employment is deprived of that interest if she is constructively discharged or forced to resign.  *Id.* (citing *Parker v. Bd. of Regents*, 981 F.2d 1159, 1162 (10th Cir. 1992)). If a plaintiff resigns of her own free will, she relinquishes her

property interest in continued employment and the defendant cannot be found to have deprived her of that property right without due process. *Id.*

Resignations are presumed voluntary. *Id.* However, to establish that the resignation was not voluntary the court is to consider whether the employee was given an alternative to resignation, whether the employee understood the options, whether the employee was given sufficient time to make the choice and whether the employee could select the effective date of the resignation. *Id.* If the employer believes there are reasonable grounds for termination and the employee has the option of resignation or termination, and the employee is given sufficient time to consider the options, then the resignation is voluntary and due process has not been denied. *Id.*

In this case, Plaintiff is not clear as to what process he claims he was due but did not get. The facts and other claims suggest, however, that he believes he was involuntarily and constructively discharged. The Court finds that the Plaintiff has not directly responded to Defendants' procedural due process argument. Therefore, the Court has examined the evidence in the record to determine if there is sufficient evidence to establish the essential elements of his claim. The Court finds that, as a matter of law, Plaintiff cannot establish a claim for denial of procedural due process.

There is no genuine issue of material fact but that Harris was given the choice to resign or be terminated. In addition, he fully understood the options as he testified that he discussed them with his wife and union steward. Harris was given until the next morning to make his decision, but he chose to cut that time short and tender his resignation that same day. The Sixth Circuit has held that seven hours is a reasonable amount of time to decide. (See *Rhoades*, 103 Fed.

13

Appx. at 895).  In his deposition, Plaintiff stated that according to the union agreement, he was supposed to have 72 hours to decide between arbitration and resignation (Harris depo. at 285). He further testified, however, that even after his union steward advised him of this, and advised him that he could take termination and then appeal that termination, he chose not to (Harris depo at 285).  The facts are undisputed that Harris made an informed decision when he chose to resign.

Therefore, because the resignation was voluntary, Harris cannot demonstrate that he was deprived of procedural due process.  Defendant's motion for summary judgment on this issue shall be granted.

**Count IV: Violation of the Ohio Constitution - Free Speech and Assembly**

Plaintiff claims that the conduct of the Defendants deprived him of his rights of free speech and assembly as guaranteed under the Ohio Constitution.  Defendants respond that there is no private right of action for a violation of the free speech and assembly provisions of the Ohio Constitution.

Plaintiff has not responded to this argument.  However, the law is clear that Defendants' position is correct.  There is no Ohio statute that is analogous to §1983 that creates an independent cause of action to remedy violations of the Ohio Constitution.  Moreover, the provisions cited by Plaintiff are not self executing. *Heaven & Earth v. City of Clevelend*, 2003 WL 21555157, Case No. 81944 (Ohio App. 8 Dist., July 10, 2003).  Therefore, as a matter of law, Plaintiff cannot establish a claim for violation of the free speech and assembly provisions of the Ohio Constitution and Defendants' motion for summary judgment shall be granted on this issue.

**Count V: Violation of Ohio Public Policy**

14

Plaintiff claims that the alleged constructive termination is at odds with Ohio's public policy against terminating a public employee based upon that employee's association or support or refusal to associate or support a particular candidate.  Defendant argues in its motion that wrongful discharge claims are not available to public employees who are not at-will employees.

Defendant is correct, that it is well settled that in order for an employee to bring a public policy retaliation claim, the employee must have been at-will. *Kusens v.Pascal, Inc.*, 448 F3d 349, 365 (6th Cir. 2006).

As discussed above and as is not denied by Plaintiff, he is not an at-will employee.  He acknowledged and based his procedural due process argument upon his claim that he had a property right in continued employment.  He lost that right when he chose to resign.  In addition, Plaintiff does not respond with any facts to establish that he was an at-will employee and the record contains no such facts.  Therefore, Plaintiff has not produced sufficient evidence to support and Defendants' motion for summary judgment shall be granted on this issue.

**Count VI: Defamation**

Plaintiff alleges in his complaint that Defendants, with malice, made false and disparaging remarks to potential future employers of Plaintiff, thereby persuading these potential employers not to hire him.  Defendants argue in their motion for summary judgment that Harris provides no facts to support any public dissemation of any information or statements nor any facts to support the falsity of the information if it were dissemated.

To survive a summary judgement motion on defamation, the plaintiff must make a sufficient showing of the essential elements of a defamation action, which are: falsity, defamation, injury and fault. *National Medical Services Corp. v. E.W. Scripps Co.*, 573 N.E.2d

1148, 1149 (Ohio App. 1989).  Falsity is an essential element to a defamation action.  Therefore, a true statement cannot provide the basis for such an action. *Id*. at 1150.

Plaintiff has not produced any evidence that the Defendants were even contacted by any potential employer and neither has he produced evidence that anything negative or untrue was said about him.   Therefore, he cannot establish a prima facie case for defamation.

Harris specifically testified that he cannot trace the rejections to Butler County and he cannot say that Butler County is responsible for not getting the jobs (Harris depo. at 212).  Moreover, neither can Harris establish that the information he claims was dissemated was false.  Plaintiff testified in his deposition that he admitted to the conduct for which he was terminated; he admitted it was true. (Harris depo. at 185).  Therefore, if the Defendants relayed this information to potential employers it cannot be considered to be false and a prima facie case of defamation cannot be established.  Consequently, Defendants motion for summary judgment on this issues shall be granted.

### Count VII: Tortious Interference with an Employment Relationship

Ohio law recognizes both a claim of tortious interference with contractual (or business) relations and a claim of wrongful interference with an employment relationship.  *Dryden v. Cincinnati Bell Tel. Co.*, 734 N.E.2d 409, 413 (Ohio Ct. App. 1999).  The two torts are not synonymous. *Id.*  Tortious interference with contractual or business relations does not require a showing of malice, and is largely an adaptation of the Restatement of the Law 2d, Torts (1979), Sections 766-767. *Id.*, citing *Norwell v. Cincinnati* (May 28, 1999), Hamilton App. No. C-980366, unreported, 1999 WL 335025.  On the other hand, the tort of wrongful interference with an employment relationship requires a showing of either wanton or malicious behavior. See

16

*Contadino v. Tilow* (1990), 68 Ohio App.3d 463, 467, 589 N.E.2d 48, 50, citing cases.

The elements of the tort require that one intentionally and improperly interfere with the plaintiff's prospective contractual or business relations by (1) inducing or otherwise causing a third person not to enter into or continue the prospective relation, or (2) preventing the plaintiff from acquiring or continuing the prospective relation. *Id.*

Whether the interference is improper or privileged depends upon several factors adopted from Section 767 of the Restatement of the Law 2d, Torts. Among these are (1) the nature of the actor's conduct, (2) the actor's motive, (3) the interests interfered with, (4) the interests sought to be advanced by the actor, (5) the societal interests in protecting the freedom of action and the contractual interests of the plaintiff, (6) the proximity or remoteness of the interference, and (7) the relations of the parties. *Id.*

Plaintiff claims that the Defendants intentionally interfered with his legitimate contract and business relationships with potential employers.  Defendants respond that the facts alleged by the Plaintiff fail to establish the existence of a contract for employment with which they could have interfered.  In addition, Defendant points out that Harris' admissions establish the absence of facts supporting that any rejections of employment are related to anything the Defendants said or did.

Plaintiff did not respond to the Defendants' arguments on this issue.  Moreover, upon review of the record, the Court is satisfied that the Defendants are correct.  As discussed above in the defamation section, Harris testified in his deposition that he cannot trace any rejections to Butler County and he cannot show that they were responsible for him not getting any of the jobs for which he applied (Harris depo. at 212).

17

As Plaintiff cannot meet the prima facie case for tortious interference with a contract  or employment relationship, Defendants motion for summary judgment on this count shall be granted.

### B.      Retaliation for Political Association in Violation of the First and Fourteenth Amendments to the Constitution.

The crux of Plaintiff's complaint is that he was terminated in retaliation for not supporting Sheriff Jones, which is in violation of his constitutional right of free speech and political association.

"A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two-that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*,  175 F.3d 378, 394 (6th Cir. 1999).

"In brief, this analysis focuses on whether the adverse employment action was motivated in substantial part by the plaintiff's constitutionally protected activity.  If the plaintiff meets her burden, the burden shifts to the defendants to prove by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct. " *Sowards v. Loudon County, Tenn.*, 203 F.3d 426, 431(6th Cir. 2000)(internal citations omitted).

The Sixth Circuit has recognized that in a retaliation case, the effect on freedom of speech need not be great in order to be actionable.  *Mezibov v. Allen*, 411 F.3d 712, 721 (6th Cir. 2005),

18

*citing, Thaddeus-X*, 175 F.3d at 397.  Nevertheless,"since §1983 is a tort statute, real injury must be involved, lest we 'trivialize the First Amendment' by sanctioning a retaliation claim even if it is unlikely that the exercise of First Amendment rights was actually deterred." *Id.*

The right of political association is a well established right at the core of those activities protected by the First Amendment. *Id*. at 432.  Support of a political candidate is within the scope of the right of political association. *Id.*  Choosing not to support a particular candidate is included in that scope as well.  The choice of whom to support is unquestionably a protected right. *Elrod v. Burns*, 427 U.S. 347, 359-60 (1976).

In this case, Harris argues that he was constructively terminated because he did not support Sheriff Jones in his campaign.  To support this claim, Harris relies upon a comment allegedly made by Sheriff Jones that Harris' special commission was delayed (less than three months) because Harris did not campaign for Jones.  Harris also sets forth facts of treatment other people received, both positive and negative, with the hope of establishing that Jones had a pattern of making employment decisions based upon the employee's political allegiance to him.

With the facts Plaintiff has produced, he is able to establish the first two elements of a prima facie case of retaliation: he was engaged in a protected activity by not supporting Jones and he suffered an adverse employment action.  However, he has trouble with the causal connection element: that the adverse employment action was motivated in substantial part by his protected conduct.  Plaintiff cannot establish retaliatory discharge because he has admitted that the animosity toward him was not due to political association or lack thereof, but that Jones' animosity toward him was based upon his friendship with relatives of the Gabbard family.

Harris testified that there is a long standing feud between the Jones family and the

19

Gabbard family.  Harris stated specifically in his deposition that it "seemed like anyone who has anything to do with the Gabbards, he [Jones] was out to get them." (Harris depo at 89).  He also testified that Jones, "does not like the Gabbard girls, so he is taking it out on me" because he is best friends with all of them (Harris depo. at 93) and that he was put in the middle because the Jones and Gabbard families do not like each other (Harris depo. at 194).  Harris, therefore, has stated that the actions by Jones against him were motivated in substantial part by Jones' personal dislike for the friends of a family he does not like, rather than being based upon Harris' political affiliation.  In addition, Harris has not produced evidence to support an argument that the discord between the families is political.  Harris has not made this argument.  If he had, however, the facts are not there to support that inference.

The foregoing analysis establishes that Harris cannot make a prima facie case of retaliation for political speech.  Even when drawing all reasonable inferences in his favor, the record is clear that his termination, if based upon Jones' personal feelings for Harris, was motivated by something other than politics.  Unfair and unfortunate, perhaps, but not unconstitutional.

Moreover, even if Harris could establish a prima facie case of retaliation, he still would not be able to survive the burden shifting portion of the retaliation analysis.  In this analysis, Defendants detail Harris' contact with former inmate Tabitha Holland.  While every fact need not be reiterated here, the record is abundantly clear that Harris violated the "Association Policy" when he initiated contact and met with Ms. Holland on several occasions.  Harris also testified that he knew he could be terminated for such conduct (Harris depo at 246, 272).  Sheriff Jones testified that Harris admission was enough upon which to base his termination (Jones depo. at

20

31).  The "Association Policy" also clearly states that discipline for violation of the policy included termination. (Defendant's Motion for Summary Judgment, Ex.1, A).

Consequently, when viewing the evidence in a light most favorable to the non-moving party, there is no genuine issue of material fact but that Harris cannot establish a prima facie case of retaliation.  Based upon this and entirety of the foregoing analysis, Defendant's motion for summary judgement shall be granted.

Based on the foregoing, Defendants' Motion for Summary Judgment (Doc. 16) is hereby **GRANTED** as to all counts.  The other pending motions (Doc. # 23 and Doc. #36) are hereby denied as moot.

**IT IS SO ORDERED.**

**/s/  Michael R.  Barrett**

Michael R. Barrett, Judge
United States District Judge

21